## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **BRIAN M. JOHNSON,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:15cv00028 |
| | ) | **MEMORANDUM OPINION** |
| **NANCY A. BERRYHILL,[1]** | ) | |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| Defendant | ) | By: Pamela Meade Sargent |
| | ) | United States Magistrate Judge |

### I. Background and Standard of Review

Plaintiff, Brian M. Johnson, ("Johnson"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*,

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Berryhill is substituted for Carolyn W. Colvin, the previous Acting Commissioner of Social Security.

Case 2:15-cv-00028-PMS   Document 14   Filed 02/23/17   Page 1 of 23   Pageid#: 904

829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Johnson protectively filed his applications for DIB and SSI on February 13, 2012, alleging disability as of August 1, 2010, due to fibromyalgia; degenerative disc disease; social anxiety; depression; gastroesophageal reflux disease, ("GERD"); irritable bowel syndrome, ("IBS"); arthritis in his knees; a torn tendon of the left ankle; osteoarthritis; and high blood pressure. (Record, ("R."), at 213-22, 238, 241.) The claims were denied initially and upon reconsideration. (R. at 70-79.) Johnson then requested a hearing before an administrative law judge, ("ALJ"). (R. at 80.) The ALJ held a hearing on July 9, 2014,[2] at which Johnson was represented by counsel. (R. at 40-59.)

By decision dated July 16, 2014, the ALJ denied Johnson's claims. (R. at 15-28.) The ALJ found that Johnson met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2013. (R. at 17.) The ALJ found that Johnson had not engaged in substantial gainful activity since August 1, 2010, the alleged onset date.[3] (R. at 17.) The ALJ found that the medical evidence

---

[2] After appearing at a March 26, 2014, hearing, Johnson was advised that the hearing would be postponed so that a physical and psychological consultative evaluations could be performed. (R. at 34-39.)

[3] Therefore, Johnson must show that he was disabled between August 1, 2010, the alleged onset date, and December 31, 2013, the date last insured, in order to be eligible for DIB benefits.

established that Johnson had severe impairments, namely degenerative disc disease of the cervical, thoracic and lumbar spine; major depressive disorder, recurrent, moderate; generalized anxiety disorder with panic attacks, specified; social anxiety disorder; and adjustment disorder with depressed mood, but he found that Johnson did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17-18.) The ALJ found that Johnson had the residual functional capacity to perform simple, unskilled, light work[4] that did not require more than frequent contact with co-workers, supervisors and the public; that did not require more than occasional postural activities; and that did not require him to climb ladders, ropes or scaffolds or to work around concentrated exposure to work hazards. (R. at 19.) The ALJ found that Johnson was unable to perform his past relevant work. (R. at 26.) Based on Johnson's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Johnson could perform, including jobs as a general cashier, a cafeteria attendant and a housekeeper/cleaner. (R. at 26-27.) Thus, the ALJ concluded that Johnson was not under a disability as defined by the Act, and was not eligible for DIB or SSI benefits. (R. at 27-28.) *See* 20 C.F.R. §§ 404.1520(g) 416.920(g) (2016).

After the ALJ issued his decision, Johnson pursued his administrative appeals, (R. at 8-11), but the Appeals Council denied his request for review. (R. at 1-5.) Johnson then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§

---

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2016).

Case 2:15-cv-00028-PMS   Document 14   Filed 02/23/17   Page 3 of 23   Pageid#: 906

404.981, 416.1481 (2016). This case is before this court on Johnson's motion for summary judgment filed June 9, 2016, and the Commissioner's motion for summary judgment filed July 11, 2016.

## II. Facts

Johnson was born in 1974, (R. at 213, 217), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Johnson obtained his general education development, ("GED"), diploma and has past work experience as a pharmacy stock clerk; a delivery or moving van driver; a cutting machine operator; a route sales driver; and an auto parts clerk. (R. at 54.) Johnson testified that he was able to work two years earlier. (R. at 43.) He stated that he would have started his "social security case earlier," but he was "draw[ing] out" his unemployment and hoping he would get back surgery. (R. at 43.) Johnson stated that his right leg would "go out on" him. (R. at 44.) He stated that he used a cane full-time, unless he was at home. (R. at 44.) Johnson stated that his treating physician, Dr. Kanwal, did not write him a prescription for using a cane, but told him to "go ahead and use" it. (R. at 44-45.)

On his function report, dated November 14, 2012, Johnson stated that he could walk a mile, but needed to rest 25 minutes before starting again. (R. at 261.) He prepared his own meals daily and could do laundry, dust, sweep, mop, wash dishes and clean the toilet. (R. at 258.) He went outside every day; mowed the grass; drove; shopped twice monthly for an hour; and handled his finances. (R. at 259.) He reported that he read, watched television and talked to his friends on the phone. (R. at 260.) Johnson indicated that he used a cane, but clearly indicated that it was not prescribed. (R. at 262.)

-4-

Adrian Bentley Hankins, a vocational expert, also was present and testified at Johnson's hearing. (R. at 53-58, 208-10.) Hankins was asked to consider a hypothetical individual of Johnson's age, education and work history, who would be limited to simple, unskilled, light work that did not require more than occasional postural activities; that did not require climbing ropes, ladders, scaffolds or working around concentrated exposure to hazards; and that did not require more than frequent contact with co-workers, supervisors and the public. (R. at 55.) Hankins stated that the individual could perform jobs existing in significant numbers in the national economy, including those of a general cashier, a cafeteria attendant and a housekeeper/cleaner. (R. at 55.) Hankins was asked to consider the same individual, but who would require a sit/stand at will option. (R. at 56.) He stated that there would be jobs available that such an individual could perform, including jobs as a parking lot or gas station booth cashier, an electrical components assembler and a mail clerk. (R. at 56.)

Hankins was asked to consider the same individual as identified in the first hypothetical, but who would be limited to sedentary[5] work. (R. at 56-57.) He stated that there would be jobs available that such an individual could perform, including jobs as an addressing clerk, a food and beverage order clerk and a hand pull sealer/packager. (R. at 56-57.) Hankins stated that it would be difficult for a person to maintain competitive employment should he be absent from work more than one day a month. (R. at 58.)

---

[5] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary if walking or standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2016).

In rendering his decision, the ALJ reviewed records from Wise County Public Schools; Frank Kupstas, Ph.D., a state agency psychologist; Rebecca Joslin, Ed.D., a state agency psychologist; Frontier Health, Inc.; Holston Medical Group; Bon Secours St. Mary's Norton; Lonesome Pine Hospital; Coeburn Hospital Clinic, Inc.; Dr. G.S. Kanwal, M.D.; Indian Path Medical Center; Holston Valley Hospital Medical Center; Norton Community Hospital; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Elizabeth A. Jones, M.A., a licensed senior psychological examiner; and Diane L. Whitehead, Ph.D., a licensed clinical psychologist.

In November 2001, Johnson was seen at Frontier Health, Inc., for complaints of severe depression. (R. at 376-78.) Johnson stated that he was getting to the point to where he "could be dangerous." (R. at 378.) He stated that he had not participated in counseling other than court-ordered anger management. (R. at 378.) Johnson failed to keep his scheduled appointments in December 2001 and January 2002. (R. at 370-71.) Johnson was next seen on July 1, 2002, with complaints of depression and panic attacks. (R. at 374-75.) On August 2, 2002, Johnson again complained of depression and panic attacks. (R. at 337-47.) James Kegley, M.S., diagnosed major depressive disorder, recurrent, moderate. (R. at 342.) Kegley assessed Johnson's then-current Global Assessment of Functioning, ("GAF"),[6] score at 55.[7] (R. at 342.) Kegely opined that Johnson had no functional limitations. (R. at 352.) Johnson participated in counseling on October 10, 2002. (R. at 366.)

---

[6] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[7] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning...." DSM-IV at 32.

Kegley noted that Johnson was mildly depressed with a flat affect. (R. at 366.) On December 17, 2002, Johnson's case was closed due to noncompliance.[8] (R. at 353.)

On December 10, 2003, an MRI of Johnson's cervical spine showed degenerative disc disease with mild broad-based disc with mild flattening of the thecal sac at the C3-4 disc space; mild central disc protrusion with flattening of the thecal sac and relative loss of the ventral cerebrospinal fluid space resulting in mild acquired central canal stenosis at the C4-5 disc space; and minimal left posterolateral disc protrusion with mild left neural foraminal stenosis at the C5-6 disc space. (R. at 382.) An MRI of Johnson's lumbar spine showed mild degenerative disc disease. (R. at 382-83.)

On January 21 and 24, 2006, Johnson presented to the emergency room at Holston Valley Hospital Medical Center, ("Holston Valley"), with complaints of back pain. (R. at 748-56.) X-rays of Johnson's lumbar spine were normal. (R. at 751.) He was diagnosed with chronic back pain/strain. (R. at 748, 754.) On June 24, 2007, Johnson presented to the emergency room with complaints of back pain. (R. at 699-705.) Johnson was diagnosed with acute lumbar strain. (R. at 700.) On September 5, 2007, Johnson presented to the emergency room with complaints of back pain. (R. at 695-98.) He was diagnosed with chronic back pain. (R. at 695.) On January 5 and 8, 2008, Johnson presented to the emergency room with complaints of neck and shoulder pain. (R. at 679-87.) X-rays of Johnson's right shoulder were normal. (R. at 683.) He was diagnosed with thoracic muscle strain. (R. at 685.) On February 20, 2008, Johnson presented to the emergency room with

---

[8] Johnson did not keep his scheduled appointments other than the October 10, 2002, appointment. (R. at 354, 357-69.)

complaints of right leg and back pain after falling down some steps. (R. at 668-75.) X-rays of Johnson's lumbar spine showed mild spondylosis of the lower thoracic spine; slight spondylosis involving the anterior endplate margins of the lower thoracic spine; and a normal lumbar spine. (R. at 674.) On April 18, 2009, Johnson presented to the emergency room with complaints of chronic back pain after falling in the shower. (R. at 652-57.) X-rays of Johnson's lumbar spine were normal. (R. at 657.) He was diagnosed with back strain. (R. at 653.)

On September 14 and 16, 2010, Johnson presented to the emergency room at Holston Valley with complaints of right leg, thigh and hip pain after sleeping in a hospital chair. (R. at 621-29.) He was diagnosed with lumbar radiculopathy and right leg sprain. (R. at 622, 627.) On September 20, 2010, October 13 and 29, 2010, and January 16 and 30, 2011, Johnson presented to the emergency room with complaints of back pain. (R. at 591-600, 606-20.) He was diagnosed with low back pain and sciatica. (R. at 592, 597, 607, 612, 617.) On May 1, 18, 21 and 25, 2011, Johnson presented to the emergency room with complaints of neck pain. (R. at 569-90.) He was diagnosed with cervical radiculopathy and cervical nerve root compression syndrome. (R. at 575, 585.) X-rays of Johnson's cervical spine showed disc space narrowing at the C4-C5 disc space. (R. at 589.)

On June 14, 2013, Johnson presented to the emergency room with complaints of right leg and back pain. (R. at 499-503.) Johnson denied extremity weakness. (R. at 499.) Johnson denied emotional or cognitive complaints. (R. at 501.) Upon examination, Johnson had no tenderness in his back; his neck was supple without significant adenopathy or mass; he had clear breath sounds bilaterally without rales, rhonchi or wheezing; he had no lower extremity weakness or sensory findings; he had normal strength and tones; his reflexes were equal and

symmetrical; he walked without difficulty; he had adequate range of motion; he had no significant deformity of the lower back; he had right paravertebral spasm; and his mood, affect and cognition were normal. (R. at 501.) It was noted that Johnson could return to work the following day. (R. at 502.) He was diagnosed with sciatica. (R. at 502.)

The record shows that Johnson was treated at Holston Medical Group from March 2007 through August 2007 for various complaints such as a toothache; back, neck and knee pain; hypertension; ankle joint stiffness; nicotine dependence; and obesity. (R. at 384-410.) In April 2007, an MRI of Johnson's cervical spine showed two bulging discs, but no cord compression. (R. at 396-97.) An MRI of Johnson's lumbar spine showed disc desiccation at the L5-S1 level and a possible small disc protrusion posterolaterally on the left. (R. at 398.) An MRI of Johnson's thoracic spine showed disc protrusion posteriorly, as well as greater posterolaterally on the right at the T10-11 level, and his spinal cord appeared somewhat atrophic, but no spinal cord compression was noted. (R. at 400.)

On December 23, 2007, Johnson presented to the emergency room at Indian Path Medical Center, ("Indian Path"), for acute cervical strain. (R. at 475-81.) An x-ray of Johnson's neck showed mild endplate spondylosis bordering the C4-C5 disc space. (R. at 474.) On October 18, 2009, Johnson presented to the emergency room for complaints of chronic neck pain. (R. at 460-66.) He reported that his medications had been stolen. (R. at 461.) He denied psychological, gastrointestinal or musculoskeletal complaints. (R. at 465-66.) On May 26, 2011, Johnson presented to the emergency room at Indian Path for complaints of chronic neck pain. (R. at 439-45.) He denied psychological, gastrointestinal or musculoskeletal

complaints. (R. at 440-41.) A CT scan of Johnson's cervical spine revealed mild posterior spurring at the C4-C5 disc space, but no acute abnormality. (R. at 437.)

On May 16, 2012, Frank Kupstas, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that there was insufficient evidence to make an assessment. (R. at 299-312.) It was noted that Johnson and his attorney failed to return Johnson's activities of daily living form despite numerous attempts to obtain them. (R. at 311.) Again, on September 12, 2012, Rebecca Joslin, Ed.D., a state agency psychologist, noted that there was insufficient evidence to make an assessment for Johnson's noncompliance. (R. at 316-35.)

On August 1, 2013, Johnson presented to the emergency room at Lonesome Pine Hospital with complaints of back pain after lifting a cinder block and falling backwards onto his low back. (R. at 411-22.) He denied emotional or cognitive problems. (R. at 412.) Upon examination, Johnson had no lower extremity weakness or lack of sensation; he had normal muscle strength and tone with no motor defect; his baseline ambulation status was normal; he could walk without assistance, but with some difficulty; he had adequate range of motion; he had right and left paravertebral spasm; he had no significant deformity of the lower back; he had no extremity tenderness or edema; and negative straight leg raising tests. (R. at 413.) X-rays of Johnson's lumbar spine revealed mild chronic L4-L5 and L5-S1 disc space narrowing and confirmed no changes since April 2009 x-rays. (R. at 422.) Johnson was diagnosed with paravertebral muscle spasm and contusion of the lower back. (R. at 413.)

On August 15, 2013, Johnson presented to the emergency room at Norton Community Hospital with complaints of back pain. (R. at 773-79.) He was alert

and oriented with an appropriate affect and mood. (R. at 774.) X-rays of Johnsons's lumbar spine showed mild disc space narrowing at the L5-S1 level. (R. at 779.) Johnson was diagnosed with sciatica. (R. at 775.) On September 17, 2013, Johnson presented to the emergency room for complaints of ankle and foot pain after stepping in a hole. (R. at 767-72.) Johnson had an appropriate affect and mood, and it was noted that he was anxious. (R. at 768.) X-rays of Johnson's left ankle showed thickening in the mid shaft of the second metatarsal and a small heel spur. (R. at 772.) On October 27, 2013, Johnson presented to the emergency room with complaints of lower back pain that radiated into his right lower leg. (R. at 763-66.) Johnson's examination was normal. (R. at 764.)

On November 14, 2013, Johnson saw Dr. G.S. Kanwal, M.D., for complaints of neck and back pain after falling from a trailer hitch. (R. at 423-26.) Johnson reported depression, anxiety and stress. (R. at 424.) Dr. Kanwal diagnosed chronic back and neck pain; chronic obstructive pulmonary disease, ("COPD"); sinusitis; bronchitis; anxiety and depression. (R. at 426.) On December 12, 2013, Dr. Kanwal noted that Johnson had "marked pain" and decreased range of motion in his neck and lower back. (R. at 761.) Pulmonary examination revealed occasional rhonchi. (R. at 761.)

On December 12, 2013, Dr. Kanwal completed a medical assessment,[9] indicating that Johnson could never lift and carry any amount of weight. (R. at 428-30.) He opined that Johnson could stand and/or walk a total of two hours in an eight-hour workday and that he could do so up to 30 minutes without interruption. (R. at 428.) Dr. Kanwal found that Johnson could sit for four to six hours in an

_____

[9] Dr. Kanwal only treated Johnson five times in total, and only twice before completing his physical and mental functional assessments. (R. at 423-30, 433-35, 758-61.)

eight-hour workday and that he could do so for up to two hours without interruption. (R. at 429.) He opined that Johnson could never climb; stoop; kneel; balance; crouch; and crawl. (R. at 429.) Dr. Kanwal based these limitations upon Johnson being in chronic pain "all the time" and that he had "severe symptoms" of cervical and lumbar disc degeneration. (R. at 428-29.) Dr. Kanwal found that Johnson's abilities to reach, to handle and to push and pull were affected by his impairments. (R. at 429.) He opined that Johnson would be restricted from working around heights, moving machinery and chemicals. (R. at 430.) He noted that Johnson would be absent from work more than two days a month. (R. at 430.)

That same day, Dr. Kanwal completed a mental assessment, indicating that Johnson had a seriously limited ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment; to interact with supervisors; to deal with work stresses; to function independently; to maintain attention and concentration; to understand, remember and carry out simple job instructions; to maintain personal appearance; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 433-35.) He also found that Johnson had no useful ability to understand, remember and carry out complex and detailed instructions and to demonstrate reliability. (R. at 433-34.) He noted that Johnson would be absent from work more than two days a month. (R. at 433.) He indicated that Johnson was capable of managing his own benefits and that he may be able to perform a nonstressful, sedentary job. (R. at 435.)

On January 9, 2014, Johnson complained of neck pain that radiated into his right leg. (R. at 760.) Pulmonary examination revealed occasional rhonchi. (R. at 760.) Dr. Kanwal noted that that Johnson did not display anxiety or depression. (R. at 760.) On February 6, 2014, Johnson reported chronic pain. (R. at 759.) Dr.

Kanwal continued to diagnose chronic back pain; COPD; anxiety; depression; GERD; and sinusitis. (R. at 759.) On March 5, 2014, Johnson saw Dr. Kanwal for prescription refills. (R. at 758.)

On March 20, 2014, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, evaluated Johnson at the request of Johnson's attorney. (R. at 793-802.) Lanthorn reported that Johnson was oriented in all spheres, and his grooming and hygiene were adequate. (R. at 794, 796.) Johnson did not exhibit signs of ongoing psychotic processes, delusional thinking or hallucinations. (R. at 797.) He recalled four out of five words presented to him earlier and correctly performed Serial 7's. (R. at 798.)  The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, and Johnson obtained a full-scale IQ score of 98. (R. at 798.) Lanthorn diagnosed major depressive disorder, recurrent, moderate; and generalized anxiety disorder with panic attacks. (R. at 801.)

Lanthorn completed a mental assessment, indicating that Johnson had a very good ability to understand, remember and carry out simple job instructions. (R. at 804-06.) He opined that Johnson had a limited, but satisfactory, ability to understand, remember and carry out detailed job instructions and to maintain personal appearance. (R. at 805.) Lanthorn found that Johnson had a seriously limited ability to follow work rules; to use judgment; to interact with supervisors; to deal with work stresses; to function independently; to maintain attention/concentration; to understand, remember and carry out complex job instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 804-05.) He also found that Johnson had no useful ability to relate to co-workers and to deal with public. (R. at

Case 2:15-cv-00028-PMS   Document 14   Filed 02/23/17   Page 13 of 23   Pageid#: 916

804.) Lanthorn opined that Johnson would be absent from work more than two days a month. (R. at 806.)

On May 8, 2014, Elizabeth A. Jones, M.A., a licensed senior psychological examiner, and Diane L. Whitehead, Ph.D., a licensed clinical psychologist, evaluated Johnson at the request of Disability Determination Services. (R. at 808-12.) Johnson's grooming and hygiene were adequate. (R. at 808.) Johnson made excellent eye contact; his affect was mildly blunted; he had no difficulty with attention or concentration; there was no evidence or presentation of any disordered thought processes; his stream of conversation was appropriate; and he was rational and alert. (R. at 810.) Jones and Whitehead noted psychomotor agitation, as Johnson had to stand on two to three occasions due to back pain. (R. at 810.) Johnson was diagnosed with social anxiety disorder and an adjustment disorder with depressed mood. (R. at 811.)

Jones and Whitehead completed a mental assessment, indicating that Johnson's ability to understand, remember and carry out instructions was not affected by his impairment. (R. at 813-16.) They found that Johnson was moderately limited in his ability to interact appropriately with the public, supervisors and co-workers. (R. at 814.) No other limitations were noted. (R. at 814.)

On May 17, 2014, Dr. Steven Jackson, M.D., examined Johnson at the request of Disability Determination Services. (R. at 818-22.) Dr. Jackson observed that Johnson was in no acute distress and ambulated with a single point cane. (R. at 819.) Although Johnson appeared to have increased pain and discomfort getting onto the exam table, he did not need any assistance getting on or off the table. (R. at 819.) On examination, Johnson had significant tenderness to palpation of his low

-14-

back; he had a very antalgic gait; he had no muscle atrophy or hypertrophy; he had normal muscle bulk and tone; he had bilateral knee pain, but there was no crepitus or effusion; he had decreased range of motion of the lumbar spine; and a mildly decreased range of motion of the cervical spine. (R. at 820, 822.) Dr. Jackson diagnosed low back pain and neck pain. (R. at 820.)

On May 26, 2014, Dr. Jackson completed a medical assessment, indicating that Johnson could frequently lift and carry items weighing up to 10 pounds and occasionally lift and carry items weighing up to 20 pounds. (R. at 823-28.) He found that Johnson could sit a total of six hours in an eight-hour workday and that he could do so for up to four hours without interruption. (R. at 824.) Dr. Jackson found that Johnson could stand and/or walk up to one hour in an eight-hour workday and that he could do so for up to two hours without interruption.[10] (R. at 824.) He found that Johnson could ambulate less than five feet without the use of a cane. (R. at 824.) Dr. Jackson opined that the use of a cane was medically necessary. (R. at 824.) He found that, without a cane, Johnson could not use his free hand to carry small objects. (R. at 824.) Dr. Jackson opined that Johnson could continuously use his hands to reach; to handle; to finger; to feel; and to push/pull. (R. at 825.) He also found that Johnson had no foot abnormalities, dysfunction or weakness. (R. at 825.) Dr. Jackson opined that Johnson could occasionally climb stairs and ramps; stoop; crouch; and crawl and never climb ladders or scaffolds or balance. (R. at 826.) He found that Johnson could frequently operate a motor vehicle and never work around unprotected heights or moving mechanical parts. (R. at 827.) Dr. Jackson noted that Johnson could not travel without a companion for assistance or walk a block at a reasonable pace on rough or uneven surfaces.

_____

[10] This finding appears to be an error.

(R. at 828.) He noted that these limitations were found to first be present in May 2013. (R. at 828.)

## III.  Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2016). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920.  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2016).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner.  To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011 & West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(c), 416.927(c), if he sufficiently explains his rationale and if the record supports his findings.

Johnson argues that the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-8.) In particular, Johnson argues that the ALJ erred by giving little weight to the assessments of Dr. Kanwal, Dr. Jackson and Lanthorn. (Plaintiff's Brief at 6-8.) In addition, Johnson argues that the ALJ erred by failing to include his "medically necessary" cane in his residual functional capacity. (Plaintiff's Brief at 8.)

-17-

I find Johnson's argument that the ALJ erred by giving little weight to the assessments of Dr. Kanwal, Dr. Jackson and Lanthorn unpersuasive. (Plaintiff's Brief at 6-8.) Dr. Kanwal's treatment of Johnson began more than three years after the alleged onset date of disability and consisted of only five visits from November 2013 to March 2014. (R. at 24, 423-35, 758-61.) Dr. Kanwal rendered his extreme ratings of Johnson's functional limitations at the *second* appointment. (R. at 428-35.) He opined that Johnson could not lift or carry any weight; could never climb, kneel, crouch, stoop, balance or crawl; and would be absent from work more than two days a month. (R. at 428-30.) Dr. Kanwal completed a mental assessment, indicating that Johnson had a seriously limited to no useful ability to make all occupational, performance and personal/social adjustments. (R. at 433-35.) Dr. Kanwal diagnosed anxiety and depression during Johnson's first office visit. (R. at 426.) However, at his subsequent office visit on December 12, 2013, Dr. Kanwal noted no anxiety or depressive symptoms, and Johnson denied the same. (R. at 761.)

As the ALJ noted, Dr. Kanwal's opinion was not accompanied by a narrative statement or supported by significant findings. (R. at 24.) Such check-the-box forms, unaccompanied by explanations, are weak evidence at best, and they are not entitled to great weight even when completed by a treating physician. *See McConnell v. Colvin*, 2013 WL 1197091, at *6 (W.D.Va. 2013) (citing *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir.1993)). The record shows that a cervical spine CT scan, lumbar spine X-rays and physical exam results were essentially benign. (R. at 413, 422, 437, 820, 822.) Johnson had only mild disc space narrowing, maintained normal muscle strength and had adequate range of motion.

(R. at 413, 422, 820, 822.) Based on this, I find that the ALJ properly limited the weight he gave Dr. Kanwal's opinion.

The ALJ noted that he was giving Lanthorn's opinion "partial" weight because it was not supported by his own clinical findings or the evidence of record. (R. at 25.) Lanthorn found that Johnson was oriented in all spheres, functioning in the average range intellectually and was competent to manage his own funds. (R. at 800-01.) Johnson reported that he socialized with his mother and one or two friends, his memory was "pretty good" and he did his own shopping. (R. at 796-97.) He did well on tests of memory, Serial 7's and interpreting commonly used adages and obtained a full-scale IQ score of 98. (R. at 798.) Lanthorn opined that Johnson would be absent from work more than two days a month, but he provided no support for this conclusion. (R. at 25, 806.) The record shows that Johnson had an appropriate affect and mood. (R. at 768, 774.) Lanthorn noted that Johnson did not exhibit signs of ongoing psychotic processes, delusional thinking or hallucinations. (R. at 797.) Based on this, I find that the ALJ properly considered Lanthorn's opinion.

The ALJ noted that he was giving Dr. Jackson's opinion "partial evidentiary weight." (R. at 24.) The ALJ also noted that certain aspects of Dr. Jackson's opinion supported the residual functional capacity finding; however, he further noted that the totality of Dr. Jackson's opinion was an overestimate of Johnson's limitations, and was not supported by his own clinical findings or the record as a whole. (R. at 24.) Dr. Jackson noted that Johnson was in no acute distress; he had full strength; no sensory loss; and only some decreased range of motion of the lumbar and cervical spine. (R. at 819-20, 822.) The record shows that Johnson had no lower extremity weakness or lack of sensation; normal muscle strength and tone

with no motor defect; adequate range of motion; negative bilateral straight leg raising tests; mild disc space narrowing; and normal lumbar spine alignment. (R. at 413, 422.) In August 2013, Johnson's baseline ambulation status was normal, and he could walk without assistance. (R. at 413.) In May 2014, Johnson did not need assistance getting on or off the examination table; he appeared to be steady; and he had no sensory loss, full strength 5/5 and minimal decreased range of motion of his lumbar spine. (R. at 819-20, 822.) Based on this, I find that the ALJ properly weighed the medical evidence.

Johnson further argues that the ALJ erred by failing to include his "medically necessary" cane in his residual functional capacity. (Plaintiff's Brief at 7-8.) Social Security Rule 96–9p requires consideration of the impact of medically required hand-held assistive devices. However, in order to establish that a hand-held device is medically required, there must be medical evidence establishing both the need for the device to aid in walking or standing and the circumstances under which the device is required. *See* S.S.R. 96-9p, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 2013 Supp. Pamphlet (West 2013). Thus, even if a cane is prescribed, it does not necessarily follow that it is medically required. *See Norman v. Comm'r of Soc. Sec.*, 2015 WL 4397150, at *5 (M.D. Fla. 2015) (citation omitted); *Wimbush v. Astrue*, 2011 WL 1743153, at *3 (W.D. Va. 2011); *Eason v. Astrue*, 2008 WL 4108084, at *16 (E.D.N.C. 2008). Self-reports and references in the record from physicians that a claimant presented with an assistive device are not sufficient; there must be "an unambiguous opinion from a physician stating the circumstances in which an assistive device is medically necessary." *Tripp v. Astrue*, 489 F. App'x 951, 955 (7th Cir. 2012).

Although the ALJ mentioned that a cane was medically prescribed, he found that the record established that Johnson was neurologically intact. (R. at 23.) Johnson testified that Dr. Kanwal simply told him to use a cane without actually writing a prescription for one. (R. at 44-45.) On his function report, Johnson checked that he used a cane, but acknowledged it was not prescribed. (R. at 262.) The record is devoid of a written prescription for using a cane. The record contains a few references to Johnson's use of a cane. (R. at 44, 262, 808, 819), but these are traceable to his self-reports and to physicians' observations that he *presented* with a cane. Dr. Jackson's circling "yes" in response to the question "Is the use of a cane medically necessary?" is insufficient to establish that a cane was medically required. (R. at 824.)

Neither Johnson's function report nor his testimony establishes the frequency of his use of a cane or the circumstances for which he uses the cane. Johnson's daily activities do not suggest that he was reliant on a cane for walking or standing or that a cane was medically required for these activities. On his November 2012 function report, Johnson stated that he could walk a mile; prepare his own meals daily; do laundry; dust; sweep; mop; wash dishes; and clean the toilet. (R. at 258, 261.) He also stated that he shopped twice monthly for an hour. (R. at 259.) He did not mention that he used a cane to engage in these activities. At various emergency room visits in 2013, Johnson reported that he injured his back and/or neck while lifting and moving boxes; after stepping on a box; and after stepping in a hole. (R. at 411, 423, 502, 767, 773.) At the time of his emergency room visits, it was never noted that Johnson presented with a cane. (R. at 411, 502, 574, 584, 591, 596, 767, 773.) In November 2013, Johnson reported to Dr. Kanwal that he injured his back after he fell from a trailer hitch. (R. at 423.) In March 2014, Johnson told Lanthorn he did laundry and shopped for groceries. (R. at 796.)

A couple of months later, Johnson told Jones and Whitehead that he took out the trash. (R. at 811.) He admitted that he only started using the cane a couple of months earlier on occasions when he left the house. (R. at 808.)

From objective clinical findings, Johnson had no lower extremity weakness or lack of sensation; normal muscle strength and tone with no motor defect; adequate range of motion; negative bilateral straight leg raising tests; mild disc space narrowing; and normal lumbar spine alignment. (R. at 413, 422.) In August 2013, Johnson's baseline ambulation status was normal, and he could walk without assistance. (R. at 413.) In May 2014 Johnson did not need assistance getting on or off the examination table; he appeared to be steady; and he had no sensory loss, full strength 5/5 and minimal decreased range of motion of his lumbar spine. (R. at 819-20, 822.) Accordingly, I do not find that the ALJ was obligated to incorporate the use of a cane into the residual functional capacity finding.

Based on the above, I find that substantial evidence exists to support the ALJ's weighing of the medical evidence and his finding as to Johnson's residual functional capacity.

Based on the above reasoning, I find that substantial evidence exists to support the ALJ's conclusion that Johnson was not disabled and not entitled to benefits. An appropriate Order and Judgment will be entered.

DATED:     February 23, 2017.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE